IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DARREN HENDERSON,

      Plaintiff,                      No. 2:06-cv-01325 GEB EFB P

      vs.

T. FELKER, WARDEN, et al.,

      Defendants.              FINDINGS AND RECOMMENDATIONS

      Plaintiff is a state prisoner proceeding without counsel in an action brought under 42 U.S.C. § 1983. Plaintiff has moved for summary judgment pursuant to Rule 56, Fed. R. Civ. P. Dckt. No. 106. For the reasons that follow, the motion must be denied.

**I.    Background**

      This action proceeds on the verified amended complaint filed October 4, 2006. Dckt. No. 16. Claims currently remaining in the action are plaintiff's claims that defendants Dovey, Felker, and Roche executed and enforced unconstitutional policies pertaining to the treatment of diabetic inmates. Ninth Circuit Memorandum, Dckt. No. 56, at 2.[1] (Plaintiff's claims against other defendants and his claim against defendant Roche for alleged failure to provide medication

---

[1] Page numbers cited herein refer to those assigned by the court's electronic docketing system and not those assigned by the parties.

1 have been dismissed. *Id.*)

2      Specifically, plaintiff alleges that defendant Dovey is the Director of Corrections for the state of California and is responsible for "the overall operations" of each California prison, including High Desert State Prison ("HDSP"), where plaintiff was confined at the time he filed this action. Dckt. No. 16 at 1-2. Defendant Felker is the "superintendent" of HDSP and is responsible for its operations and the welfare of its inmates. *Id.* at 2. Defendant Roche is a medical doctor who was the Chief Medical Officer at HDSP at all times relevant to the complaint. *Id.*

     According to plaintiff, defendants adopted or enforced policies that were deliberately indifferent to his serious medical needs as a diabetic inmate. Plaintiff describes his condition as follows:

> Plaintiff is an insulin depended [sic] diabetic with related complications, high blood pressure, a condition called neuropathy which causes poor blood flow, pain and numbness in the legs and feet. It also places me at high risk for heart disease, stroke, infection and amputation. Because of my condition I require daily access to a exercise yard [sic] to walk or run to increase the blood flow to my heart and legs. I also require effective distribution of medications that improve and sustain quality in life, a special diet prepared by a medically trained dietician, and a emergency plan [sic] to prevent hypoglycemia while traped [sic] in a cell overnight.

*Id.* at 3. Plaintiff alleges that he received such treatment in a prior institution but that, when he was transferred to HDSP on August 11, 2005, the needed treatments (exercise, medication, diet, and emergency plan) were stopped according to a screening policy in place at HDSP. *Id.* His prescriptions for blood pressure and pain medication were discontinued. *Id.* No special diet was provided, nor any emergency snack, because HDSP, per policy, does not provide special diets or emergency snacks to diabetic inmates. *Id.* at 3-4. Further, HDSP policy only allowed inmates to access the yard for 1.5-2 hours five times per month. *Id.* at 4.

     After complaining, plaintiff was seen by a doctor who prescribed blood pressure and pain medication (enalapril and neurontin, respectively). *Id.* Plaintiff received the enalapril on August 26, 2005. *Id.* Plaintiff received the neurontin on September 5, 2005, but was only given enough

for one month. *Id.* at 5. He had to wait over 30 days for a refill, suffering pain in his legs and feet. *Id.*

Plaintiff alleges that he developed a skin infection on one of his toes because of the lack of exercise to increase blood flow to his legs and feet. *Id.* at 6.

In sum, plaintiff alleges that defendants are responsible for several policies, which together prevented him from receiving adequate treatment for his diabetes: (1) a policy to discontinue medications upon an inmate's transfer to HDSP; (2) a policy resulting in the erratic distribution of neurontin; (3) a policy to deny diabetic inmates a special diabetic diet; (4) a policy of inadequate yard-time for diabetic inmates; and (5) a policy depriving diabetic inmates of an emergency snack to treat hypoglycemia.

Defendants concede that plaintiff arrived at HDSP on August 11, 2005 and had been "prescribed medication and a treatment program for his serious medical needs" at his prior institution. Dckt. No. 114-2, Defs.' Responses to Plaintiff's Undisputed Facts (hereinafter "DPUF") 1-2. Defendants dispute, however, that HDSP had a screening policy under which inmates' medications are discontinued at transfer. DPUF 3; Dckt. No. 114-2, Defs.' Statement of Undisputed Facts ISO Defs.' Mot. for Summ. J. (hereinafter "DUF") 14. Defendants further dispute that they are responsible for plaintiff's medications or diabetic meal plan policies. DUF 3-6, 8-13, 27. According to defendants, plaintiff received his necessary medication, and it was not necessary for plaintiff to have an emergency snack, because he could obtain one from the prison clinic or a Medical Technical Assistant if needed. DUF 22, 23. Defendants assert that the standard prison menu provided adequate healthful food for plaintiff and that plaintiff could get enough exercise by exercising in his cell when yard time was not provided. DUF 25, 26, 28-36. Lastly, defendants dispute that plaintiff's skin infection was due to lack of exercise, lack of proper medication, and/or poor diet, because, at the time of the infection, plaintiff's blood sugars "were within the normal range." DUF 37.

////

## II. Summary Judgment Standards

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant to the determination of the issues in the case, or in which there is insufficient evidence for a jury to determine those facts in favor of the nonmovant. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986); *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994). At bottom, a summary judgment motion asks whether the evidence presents a sufficient disagreement to require submission to a jury.

The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims or defenses. *Celotex Cop. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, the rule functions to "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). Procedurally, under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson.*, 477 U.S. at 248; *Auvil v. CBS "60 Minutes"*, 67 F.3d 816, 819 (9th Cir. 1995).

A clear focus on where the burden of proof lies as to the factual issue in question is crucial to summary judgment procedures. Depending on which party bears that burden, the party seeking summary judgment does not necessarily need to submit any evidence of its own. When the opposing party would have the burden of proof on a dispositive issue at trial, the moving

4

party need not produce evidence which negates the opponent's claim. *See e.g., Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Rather, the moving party need only point to matters which demonstrate the absence of a genuine material factual issue. *See Celotex*, 477 U.S. at 323-24 (1986). ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322. In such a circumstance, summary judgment must be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

To defeat summary judgment the opposing party must establish a genuine dispute as to a material issue of fact. This entails two requirements. First, the dispute must be over a fact(s) that is material, i.e., one that makes a difference in the outcome of the case. *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Whether a factual dispute is material is determined by the substantive law applicable for the claim in question. *Id.* If the opposing party is unable to produce evidence sufficient to establish a required element of its claim that party fails in opposing summary judgment. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322.

Second, the dispute must be genuine. In determining whether a factual dispute is genuine the court must again focus on which party bears the burden of proof on the factual issue in question. Where the party opposing summary judgment would bear the burden of proof at trial on the factual issue in dispute, that party must produce evidence sufficient to support its factual

claim. Conclusory allegations, unsupported by evidence are insufficient to defeat the motion. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989). Rather, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue for trial. *Anderson*, 477 U.S. at 249; *Devereaux*, 263 F.3d at 1076. More significantly, to demonstrate a genuine factual dispute the evidence relied on by the opposing party must be such that a fair-minded jury "could return a verdict for [him] on the evidence presented." *Anderson*, 477 U.S. at 248, 252. Absent any such evidence there simply is no reason for trial.

The court does not determine witness credibility. It believes the opposing party's evidence, and draws inferences most favorably for the opposing party. *See id.* at 249, 255; *Matsushita*, 475 U.S. at 587. Inferences, however, are not drawn out of "thin air," and the proponent must adduce evidence of a factual predicate from which to draw inferences. *American Int'l Group, Inc. v. American Int'l Bank*, 926 F.2d 829, 836 (9th Cir.1991) (Kozinski, J., dissenting) (citing *Celotex*, 477 U.S. at 322). If reasonable minds could differ on material facts at issue, summary judgment is inappropriate. *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). On the other hand,"[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). In that case, the court must grant summary judgment.

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* If the evidence presented and any reasonable inferences that might be drawn from it could not support a judgment in favor of the opposing party, there is no genuine issue. *Celotex.*, 477 U.S. at 323. Thus, Rule 56 serves to screen cases lacking any genuine dispute over an issue that is determinative of the outcome of the case.

////

////

6

### III. Analysis

As mentioned above, plaintiff's remaining claims are against defendants Dovey, Felker, and Roche for violating the Eighth Amendment by promulgating policies that deprived him of necessary medication, diet, exercise, and emergency snack. Plaintiff alleges that the lack of medication, proper diet, and adequate exercise acted in concert to cause him to develop a skin infection.

The Eighth Amendment of the U.S. Constitution protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement. *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). Extreme deprivations are required to make out a conditions of confinement claim, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

To succeed on an Eighth Amendment claim predicated on the denial of medical care, a plaintiff must establish that he had a serious medical need and that the defendant's response to that need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A serious medical need exists if the failure to treat plaintiff's condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Jett*, 439 F.3d at 1096. An officer has been deliberately indifferent if he was (a) subjectively aware of the serious medical need and (b) failed to adequately respond. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

Neither a defendant's negligence nor a plaintiff's general disagreement with the treatment he received suffices to establish deliberate indifference. *Estelle*, 429 U.S. at 106; *Jackson v. McIntosh*, 90 F.3d 330, 331 (9th Cir. 1996); *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). Evidence that medical caregivers disagreed as to the need to pursue one course of treatment over another is also insufficient, by itself, to establish deliberate indifference. *Jackson*, 90 F.3d at 332. Rather, the plaintiff must show that the course chosen by

7

the defendants was medically unacceptable under the circumstances. *Jackson*, 90 F.3d at 332. When a prisoner alleges a delay in medical treatment, he must show the delay caused an injury. *See McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), *overruled on other grounds, WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc); *see also Wood v. Housewright*, 900 F.2d 1332, 1334-35 (9th Cir. 1990) (several day delay in treatment did not violate Eighth Amendment where there was no emergency and given plaintiff's condition, i.e., a severe shoulder injury, the only remedy immediately available was painkillers).

Finally, "a prison official can violate a prisoner's Eighth Amendment rights by failing to intervene" to prevent a violation imposed by someone else. *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995). A defendant-officer may be held liable for failing to intervene when he had enough time to observe what was happening and to intervene and prevent or curtail the violation, but failed to do so. *See Lanier v. City of Fresno*, 2010 U.S. Dist. LEXIS 130459, 2010 WL 5113799, at *6 (E.D. Cal. Dec. 8, 2010) (citations omitted).

It is undisputed that plaintiff suffers from a serious medical need (diabetes). Thus, the court must determine whether the evidence is so one-sided that summary judgment in plaintiff's favor is appropriate.

<u>Alleged Policy to Discontinue Transferee Medications.</u>  Plaintiff claims that defendants are responsible for a policy at HDSP to discontinue the medications of inmates upon their transfer to that institution. Dckt. No. 106, Pl.'s Statement of Undisputed Facts ISO Mot. for Summ. J. (hereinafter "PUF") 3. Plaintiff cites as support for that claim his Exhibit C.[2] Dckt. No. 106 at 43-56 (Ex. C). Exhibit C consists of: (1) plaintiff's "Health Care Services Request

---

[2] Plaintiff requests judicial notice for his exhibits. However, the exhibits consist primarily of plaintiff's medical records, inmate healthcare appeal records, information sheets from various sources concerning diabetes, documents that appear to have originated with the California Department of Corrections and Rehabilitation ("CDCR"), and inmate declarations. These items of evidence are not appropriate subjects of judicial notice. Fed. R. Evid. 201. Accordingly, the court must determine the admissibility of plaintiff's evidence on other grounds. These items are addressed in note 3, below. Other exhibits contain printout copies of CDCR regulations, which constitute citation to legal authority for which judicial notice is not necessary.

Form," in which plaintiff stated that he had not received his medication since his transfer to HDSP and was suffering from pain and poor circulation; (2) documents from plaintiff's inmate appeal regarding the denial of neurontin, enalapril, exercise, diabetic diet, and a diabetic snack; and (3) a memorandum signed by defendant Roche providing, "For numerous health care reasons the present process of providing nutrition bags to all diabetics will stop."[3] These documents provide no evidence that HDSP operated under a policy to discontinue the medications of inmates upon their transfer there, much less that the policy was promulgated or

---

[3] Defendants object to Exhibit C and many of plaintiff's other exhibits and purported undisputed facts. Dckt. No. 116. Unless otherwise noted herein, the undersigned concludes that plaintiff's evidence, even if admissible, does not support the grant of summary judgment in his favor. Accordingly, the court need not entertain the bulk of defendants' evidentiary objections at this time. Nonetheless, the court expressly overrules defendants' objections here.

In order properly to support or oppose summary judgment, the party relying on affidavits and records must lay a proper foundation. *Beyne v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988). The court agrees that "whether the authentication requirement should be applied to bar evidence when its authenticity is not actually disputed is, however, questionable." *Burch*, 433 F. Supp. 2d at 1120. However, the documents plaintiff submits were obtained by the plaintiff from the prison officials and defendants do not specifically assert that any given document is not a true and accurate copy but is, instead a forged or altered document. "[W]here the objecting party does not contest the authenticity of the evidence submitted, but nevertheless makes an evidentiary objection based on purely procedural grounds," then the court should consider the evidence. *Id.* In such a situation, it would appear equally probable that the documents are what they purport to be as it is that they are not. *See Id.*

Here, defendants do not actually contest the authenticity of the documents. Indeed, their general objection is particularly suspect because all the documents plaintiff submits would find their source in the prison system, either in plaintiff's files or in the prison bureaucracy. Thus, if there were a valid basis for contesting their authenticity, defendants could unearth and present it. But they have not. Therefore, all defendants' objections for lack of proper foundation and lack of authentication are overruled.

Defendants also object on hearsay grounds. The objections are *pro forma* in that defendants object to entire documents, not particular statements. An objection based on hearsay inherently is bound to the context in which the allegedly objectionable evidence is offered. *See Burch*, 433 F. Supp. 2d at 1122 ("even seemingly appropriate objections based on hearsay and failures to authenticate/lay a foundation are difficult to address away from the dynamics of trial.") Insofar as a letter or record may on its face constitute hearsay, the particular statements upon which plaintiff relies may very well either be admissible nonetheless or may not be hearsay, depending on the purpose for which plaintiff offers the statement. "The court is not inclined to comb through these documents, identify potential hearsay, and determine if an exception applies - all without guidance from the parties." *Id.* at 1124. Thus, to prevail on a hearsay objection, defendants must object to particular statements and explain the objection. Defendants' failure to do so is sufficient basis for overruling the objection.

For these reasons, defendants' objections to the plaintiff's evidence submitted in opposition to this motion is denied.

9

executed by any of the defendants. The undersigned has reviewed plaintiff's other exhibits and finds no evidence establishing such a policy there, either. The only evidence relevant to the claimed transfer policy is a medical chart notation indicating that plaintiff's prescription for neurontin was discontinued upon his transfer by a Dr. James (Exhibit A) and some policies from California State Prison, Sacramento ("CSP-Sac") which indicate that institution's stated policy to maintain continuity of medications upon transfer (Exhibits B, F). Plaintiff has not offered evidence that Dr. James's decision to discontinue his neurontin on August 11, 2005 was made pursuant to a policy to discontinue medications upon transfer or that such a policy, if it existed, was promulgated or executed by defendants. Accordingly, plaintiff has not shown that he is entitled to summary judgment in his favor on his claim that defendants promulgated or executed a policy to discontinue his necessary medications upon his transfer to HDSP.

<u>Alleged Policies Causing Erratic Distribution of Medication.</u> Plaintiff claims that there was a policy in place at HDSP that caused the erratic distribution of his neurontin. PUF 6. Under this alleged policy, HDSP issued medication "in 30 and 90 day intervals, then refills [took] up to 30 days or more." *Id.* Plaintiff cites to his Exhibit F as support for this assertion. Exhibit F consists of: (1) a "Health Care Services Request Form" dated October 19, 2005, in which plaintiff complained that his neurontin refill had not been provided for two weeks; (2) a medication order dated November 10, 2005, ordering neurontin for plaintiff for 90 days; (3) various medication orders from 2006 the relevance of which is not apparent; and (4) a "Local Operational Procedure" document from CSP-Sac entitled "Medication Management," revised in May 2010, providing policies regarding that institution's management of inmate medications, including a mechanism for ensuring that inmates receive their medication while awaiting a new prescription (Docket No. 106-1 at 29-30). Dckt. No. 106-1 at 13-35 (Ex. F). These documents do not establish a policy in existence at HDSP in 2005 to issue medications in 30 or 90 day intervals and then to delay refills for 30 days or more. The November 10, 2005 order for neurontin for 90 days could have been made under such a policy, but could also simply have

resulted from the prescribing physician's preference. No other documents within plaintiff's exhibits evidence the policy of which plaintiff complains.

However, defendant Roche essentially concedes that a prison policy delays the processing of a neurontin prescription, because the drug "is considered a non-formulary medication and must be approved before it is given to a patient." Dckt. No. 114-3, Roche Decl. ISO Defs.' Opp'n to Pl.'s Mot. for Summ. J., ¶ 17. Under this policy, a physician could make an "emergency request" for the non-formulary drug to expedite the processing of the prescription. *Id.* at ¶ 19. Plaintiff's physicians did not make such a request in August of 2005, however. *Id.* at ¶ 20. Thus, while a prison policy did exist that could have delayed plaintiff's receipt of his neurontin, defendants have raised a triable issue as to whether any delay was due to that policy or to the failure of plaintiff's treating physicians to make an "emergency request" for the drug, and summary judgment in plaintiff's favor is not appropriate.

Plaintiff further claims that "over the counter and non-formulary medications have been discontinued for issue to indigent inmates." PUF 10. Presumably, plaintiff believes that this alleged policy disrupted his receipt of neurontin. *See* Dckt. No. 16 (Pl.'s Am. Compl.) at 11 (alleging that, because neurontin is a non-formulary drug, the Chief Medical Officer of the institution (defendant Roche) was required to personally approve the prescription). As support for this assertion, plaintiff cites his Exhibit J. Exhibit J consists of a single unidentified document bearing the heading "Over-The-Counter (OTC) and Non-Formulary Items (NF)" and listing various medications and supplements not including neurontin. Dckt. No. 106-2 at 17. This document does not support plaintiff's claim that HDSP operated under a policy in 2005 to discontinue over the counter and non-formulary medications to indigent inmates. Nor do any of plaintiff's other exhibits. As discussed above, defendants have conceded that, under a prison policy, neurontin was designated "non-formulary" at the relevant time, but a triable issue exists as to whether that policy was responsible for any delay or disruption in plaintiff's receipt of the medication.

11

Lastly, plaintiff asserts that HDSP had a policy of making inmates take pills "crushed up." PUF 11. According to plaintiff, this method of consumption could "possibly kill a person because the time release is off, some medications burn the inside of the mouth when 'crushed up,' and the taste is like chewing aspirin." *Id.* This assertion is irrelevant, as plaintiff's complaint bears no allegations regarding being forced to consume medications "crushed up." Further, plaintiff's evidence does not support the allegation. As support for this claim, plaintiff cites to his Exhibit K. Exhibit K consists of a memorandum dated September 3, 2008 from Dorothy Swingle, John Nepomuceno, and Charles Nielsen, senior medical staff at HDSP, providing that controlled substances, including neurontin, were to be administered crushed and floated in water. Dckt. No. 106-2 at 20. The memorandum states, however, that "controlled release medications . . . cannot be crushed." *Id.* This document does not support plaintiff's claim that the crush-and-float method of consumption could "kill a person because the time release is off," as the memorandum provides that controlled release drugs are not to be crushed. Further, plaintiff has not provided any evidence that he himself has had to take medications in this manner or that he has experienced any ill effects from taking medications in this fashion. Accordingly, plaintiff has not established that the crush-and-float policy caused a violation of his Eighth Amendment rights.

<u>Alleged Policy to Deny Diabetic Inmates a Special Diet.</u>  Plaintiff asserts that, when he arrived at HDSP, he was told that "there were no diet plans for Diabetic inmates, and that Diabetics could remove the high carbohydrate foods from their meal tray (without a substitutions [sic]) and still receive adequate nutrition." PUF 3. According to plaintiff, the standard prison diet does not accommodate his needs as a diabetic: "even when main courses consist of cinnamon rolls, coffee cake, pancakes, pasta and potatos [sic], diabetics are unreasonably encouraged to just don't eat it." PUF 7. Plaintiff cites his Exhibits C and G as support. Exhibit C consists of: (1) plaintiff's "Health Care Services Request Form," in which plaintiff stated that he had not received his medication since his transfer to HDSP and was suffering from pain and

poor circulation; (2) documents from plaintiff's inmate appeal regarding the denial of neurontin, enalapril, exercise, diabetic diet, and a diabetic snack; and (3) a memorandum signed by defendant Roche providing, "For numerous health care reasons the present process of providing nutrition bags to all diabetics will stop." Dckt. No. 106 at 43-56. Exhibit G consists of: (1) a "Local Operational Procedure" from CSP-Sac entitled "Outpatient Therapeutic Diets," which provides that the standard prison "Heart Healthy" diet is appropriate for diabetic inmates, who are to be educated regarding proper eating and may obtain nourishments and supplements with a doctor's order (Docket No. 106-1 at 37-38); (2) certain CDCR regulations regarding "Food Services"; and (3) plaintiff's inmate appeal forms. Dckt. No. 106-1 at 36-47.

Defendants concede that the policy at HDSP at the relevant time was for diabetics to eat from the normal prison menu, removing items that were inconsistent with diabetic health. Dckt. No. 114-4, Maurino Decl. ISO Defs.' Opp'n to Pl.'s Mot. for Summ. J. According to defendants, the standard issue of food is 300 calories more than is required, and thus diabetics can remove food and still get enough nourishment. *Id.* at ¶ 14. While plaintiff disputes that he could receive enough food this way, defendants have raised a triable issue of fact as to whether the diet policy for diabetics at HDSP at the relevant time provided adequate diabetic-healthy nutrition and was therefore permissible under the Eighth Amendment. Accordingly, plaintiff is not entitled to summary judgment on this issue.

<u>Alleged Policy to Deprive Diabetic Inmates Necessary Exercise.</u> Plaintiff asserts that he was placed on a "lockdown yard/program" at HDSP which was "in cell no movement 24 hours a day" for 9-10 months per year. PUF 3, 8.[4] As support, plaintiff cites his Exhibits C and H. Exhibit C consists of: (1) plaintiff's "Health Care Services Request Form," in which plaintiff stated that he had not received his medication since his transfer to HDSP and was suffering from

---

[4] Plaintiff further alleges that he is currently housed at CSP-Sac, where "diabetic inmates are only allowed yard access 10 days per 30, the remaining 20 days are in cell 24 hours a day." PUF 8. Plaintiff's allegations regarding CSP-Sac are not part of the operative complaint and thus are immaterial to the claims at issue here. *See* Dckt. No. 16.

pain and poor circulation; (2) documents from plaintiff's inmate appeal regarding the denial of neurontin, enalapril, exercise, diabetic diet, and a diabetic snack; and (3) a memorandum signed by defendant Roche providing, "For numerous health care reasons the present process of providing nutrition bags to all diabetics will stop." Dckt. No. 106 at 43-56. Exhibit H consists of: (1) plaintiff's inmate appeal regarding the exercise issue, in which he was told by an appeals reviewer that his treating physician could order an exercise accommodation but had not done so; (2) a "C Facility Yard Schedule" from March 2010; (3) a CDCR Diabetes information sheet, which states that diabetics must exercise regularly; and (4) declarations from plaintiff and two other inmates regarding the yard schedule at CSP-Sac. Dckt. No. 106-1 at 48, Dckt. No. 106-2 at 8. Further, in plaintiff's verified responses to defendants' undisputed facts submitted in support of their cross-motion for summary judgment, plaintiff attests, "Diabetic inmates must try to exercise in a cell that is inadequate in size to exercise in, placing inmates into further risk of harming themselves on metal fixtures." Dckt. No. 125 at 5.

Defendants assert that "[d]iabetic inmates can maintain a healthy lifestyle for their diabetic condition by exercising in their cell." Dckt. No. 114-1, Defs.' P. & A. ISO Defs.' Mot. for Summ. J. and Opp'n Pl.'s Mot. for Summ. J. at 4; Dckt. No. 114-3, Roche Decl. at ¶ 35. Plaintiff has not provided the court with evidence regarding the type of daily exercise necessary to maintain health as a diabetic nor described why his cell is too small to perform that type of exercise. According to defendants, the cell provides sufficient space. Accordingly, on the evidence currently before the court, a triable issue of fact exists as to whether defendants' lockdown policies (or failure to provide some exception from those policies for diabetic inmates like plaintiff) prevented him from getting the exercise he needed to maintain health.

<u>Alleged Policy to Deny Diabetic Inmates an Emergency Snack.</u>  Plaintiff asserts that, when he arrived at HDSP, he was told "that a medical policy discontinued diabetic snack bags for insulin depended [sic] Diabetics." PUF 3. Plaintiff has produced as support a memorandum from defendant Roche in 2003, stating:

14

> For numerous health care reasons the present process of providing nutrition bags to all diabetics will stop. The issuance of such bags with the added calories is not felt to be in keeping with quality diabetic care. Therefore . . ., there will be a change in the current procedure involved with providing this item.
>
> ***
>
> Patients with diabetes are to be enrolled in the Diabetic Chronic Care Clinics where the physicians will continue to care for their health problems. Diabetic nutrition bags may be issued in the future for those where the added calories are felt by the medical staff to help their disease.

Dckt. No. 106 at 55. According to defendant Roche, if a diabetic inmate experiences hypoglycemic shock, he may obtain glucose gel from the Clinic or a Medical Technical Assistant. Dckt. No. 114-3, Roche Decl. at ¶ 33. Plaintiff attests that, because an inmate may be unable to yell for help when experiencing hypoglycemic shock, it is medically necessary for diabetic inmates to have a snack or glucose gel in their cells. Dckt. No. 125 at 5. Defendants move to strike plaintiff's claim regarding the need for an emergency supplement as unqualified medical opinion. While plaintiff is not a medical doctor and is not qualified to testify as to applicable standards of care and medically necessity,[5] he is certainly able to describe his own personal experiences as an insulin-dependent diabetic regarding access or lack of access to an emergency snack at hand when experiencing a low blood sugar reaction to insulin. However, even with plaintiff's assertion, he simply underscores a factual dispute and has not shown that he is entitled to summary judgment on the matter.

////
////
////
////

---

[5] Federal Rules of Evidence 701 and 702 together require that testimony based on scientific, technical, or other specialized knowledge must be provided by a witness qualified as an expert by knowledge, skill, experience, training, or education. *See, e.g., Wilson v. Woodford*, No. 1:05-cv-00560-OWW-SMS (PC), 2009 U.S. Dist. LEXIS 25749 at *85-86 (E.D. Cal. Mar. 30, 2009) (finding plaintiff unqualified to testify that the alleged misconduct of defendants caused him possible kidney damage and neuropathy).

**IV.    Order and Recommendation**

Accordingly, it hereby RECOMMENDED that plaintiff's November 17, 2011 motion for summary judgment (Docket No. 106) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated:  August 14, 2012.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE